Good morning, your honors. Deputy Attorney General Dana Muhammad Ali for the warden. I'd like to reserve five minutes of my time for rebuttal. May it please the court. In granting relief on Petitioner's Miranda claim, the district court erred in three critical respects. First, there was no clearly established Supreme Court precedent requiring the state courts to grant relief on Petitioner's claim. Second, the California Court of Appeal reasonably determined the facts in light of the evidence before it and reasonably applied then existing Supreme Court precedent, namely Miranda and Davis, in denying Petitioner's claim. Third, Petitioner's statements that he was present at the scene of the shooting but that he was not involved in the shooting in any way and had no idea that it was going to occur did not have a substantial and injurious effect on the jury's verdict in light of other compelling evidence of Petitioner's guilt. Now, as this court is well aware, under Section 2254D, relief is barred on a claim that has been adjudicated on the merits in state court unless that decision, that state court decision, was contrary to or it involved an unreasonable application of clearly established Supreme Court precedent, or if that decision involved an unreasonable determination of the facts. Where there's no clearly established Supreme Court precedent, relief or, pardon me, where there's no clearly established Supreme Court precedent on a particular claim, relief is barred under Section 2254D. Ms. Lee, the problem I'm having with the case is that we have the Miranda decision, which basically says that if the defendant clearly invokes his right to remain silent, all questioning must cease. And Mr. Cleat said, I choose to remain silent. I don't know how a person could say any more clearly that I'm invoking my right to remain silent under Miranda. And if that's the case, isn't it incumbent upon the detectives at that point to say our interview is over? Miranda, Your Honor, I understand. The statement, I choose to remain silent, there's no dispute that that statement taken in a vacuum is facially unambiguous. However, if you look at the circumstances leading up to that purported invocation, that statement, I choose to remain silent, it was reasonable for the detectives to determine that that was an ambiguous invocation. Ms. Lee, I wrote my heart out in dissent in Anderson v. Terhune making just that argument, and I lost. And that was a much more ambiguous statement. I plead the fifth. And then you had a somewhat sarcastic reply by the homicide detective. What does that mean? Right. You're not, there's nothing ambiguous about I choose to remain silent. In this context, Your Honor, I respectfully disagree. The circumstances leading up to that. Well, clearly he had been chatting and appeared to indicate that he wanted to cooperate with the officers. But then, for whatever reason, they decided to re-admonish him of his Miranda warnings once they got him into the interview room. And? They had to re-admonish him, Your Honor, because they had, for the first time, they had Mirandized Petitioner when he was arrested in Long Beach, and they had not spoken to him about the murder at that point. Okay. So they had to do it because now we're going to talk about this murder. Exactly. Okay. Let me ask a question. Sure. I'm not sure I agree he said, I choose to remain silent. Wasn't it prefaced by something? Yes. Why don't you explain that then? Well, before that, before they entered the interview room, first of all, this is where it. No, no, no. Oh, I'm sorry. I'd like you to focus on the statement because the original question by Judge Tolman was the statement. Right. So if we're just excising that statement, there's a lot of lead-up to that. The detectives had read his Miranda rights. He said he understood them. And then they asked him one last time, do you wish to, I believe the question, okay, do you wish to give up your right to remain silent? In other words, do you want to talk to me now about what we talked to you about? That was Detective Felix. Petitioner said, you're going to let me stop talking when I want to stop talking, right? And then he says, again, and there's approximately 11 seconds of silence. And he says, another three seconds of silence go by. And he says, I choose to remain silent. Now, the detectives were naturally surprised by that. Petitioner had just told them before they entered the interview room that he was willing to speak to them about this murder. So it was a natural response for the detectives to be surprised because that's the very definition of being equivocal. Are you arguing that they were expressing surprise or they were asking a follow-up question? Both, Your Honor. Both. They wanted to clarify his intent. But Detective Dupree said that I understood him to say I want to remain silent. What more do you need to know to decide his intent? The detective understood what he meant when he said that. Here, Your Honor, it was reasonable for the state courts to determine. I mean, the state courts had the benefit of, for example, the trial court was in the best position to determine, you know, whether the detectives were being, whether the detectives were credible. Detective Dupree testified at the evidentiary hearing on the suppression motion in the trial court. And so did Petitioner. And the trial court made credibility findings, finding that the detective's testimony was credible and that Petitioner's testimony was not credible. And, you know, that surprise, I mean, the fact of the matter remains is that if this court ---- I thought the credibility determination had to do with statements that he and Flowers made in Long Beach. Right, right. That's correct, Your Honor. That doesn't mean that when he said, I choose to remain silent, he wasn't being credible about saying, I choose to remain silent, does it? No, you're correct, Your Honor. Well, in fact, if you're really going to rely on the state court, you can only rely on the idea that the California Court of Appeals said that the detective Dupree and Defective Felix spontaneously uttered expressions of surprise. Correct. They didn't talk about questions of explanation. Correct. So we can't substitute that in. We can only talk about questions of surprise. Correct. And the tape recording and transcript confirm. Then the detective's questions as spontaneous expressions of surprise. Correct. Rather than direct requests for clarification. So after giving two declarations of surprise, what did he say? I'll talk. Right? Correct, Your Honor. So the whole circumstance is, you're going to let me stop talking when I want to stop talking, right? I choose to remain silent. Two surprise declarations, and then he says, I'll talk. Correct. And then they say, do you wish to give up the right to speak to an attorney and have an attorney present during questioning? So in other words, you want to talk to us, huh? Right. Isn't that what really happened? That is what happened, Your Honor. Okay, so help me distinguish Sessoms v. Reynolds, because in Sessoms v. Reynolds we had a very similar situation where during the admonishment of the rights, the defendant said, my father wanted to know, would it be possible for me to have a lawyer? And then the detectives went on and on about, well, we could get you a lawyer, and a lawyer's going to come in here, he's going to tell you not to talk to us, and it's your decision and you have to make it. And then he says, I'll talk. Right. And we applied to ed pediferance at the three-judge panel level, and we said that's not an objectively unreasonable determination. He waived. Right. The Ninth Circuit reheard it in bank, and we're still waiting for a decision. Right. But it's not looking good for the three-judge panel. It doesn't look good if, in fact, they've got it still en banc. Right. And then we had the decision. Especially if you read the names on the panel. Right. And then we had the decision in Duty v. Shiro, where the defendant was accused of murdering nine people in Phoenix, and the detectives interrogated him for 13 hours, and they had a written waiver. And, I mean, you know, it's as strong as you might expect. And we said his constitutional rights were violated. Right. And the Supreme Court denied cert on that case. Right. So in the face of all of this Ninth Circuit precedent, how can I distinguish Mr. Kliat's case from these other cases? Well, Your Honor, the way that you can distinguish this case is that, in the first instance, relief was barred because there was no clearly established Supreme Court precedent addressing this particular issue. I don't understand why Miranda is not clearly established. Miranda is clearly established for the proposition that a suspect must read his Miranda rights, and that if he indicates in any manner that he wishes to stop questioning, cease questioning, the police, all questioning must cease. But doesn't it turn on whether it's an ambiguous or an unambiguous assertion? Yes, it does, Your Honor. Yes, it does. So even if Miranda ---- Tell me why that is. The sentence is, if the individual indicates in any manner, we're not talking about ambiguous or unambiguous, in any manner at any time that he wishes to remain silent. Correct. That is what Miranda says. And Miranda provides a very general rule that the state courts and the circuits have been trying faithfully to apply. Miranda itself, there is a portion of Miranda that says, if a suspect is indecisive about invoking his right to counsel, then questioning doesn't necessarily need to cease at that point. But the subsequent cases have said that the officers are then permitted to ask clarifying questions. That's correct, Your Honor. And that's to make sure that he really is invoking his constitutional right. That's correct, Your Honor. But I thought you already agreed with me that based on Detective Dupree's hearing testimony, he understood what Mr. Cleat had done. He had invoked his right to remain silent. And he was surprised by that. I think that ---- But surprise doesn't equal ambiguity. Surprise does not equal ambiguity. But he was surprised at the equivocation. He wanted to clarify his intent. What equivocation? Because he just told the detectives prior to entering the interview room that he was willing to speak to them. So that's the very definition of being equivocal. He told them, yes, I'm willing to talk to you about what I know. So they went into the interview room and they, you know, turned on the tape recorder and went through the Miranda rights for this particular, you know, particular charge. And it was completely reasonable for a detective in the detectives in this case. It was completely reasonable for them. Given the circumstances leading up to that statement, I choose to remain silent, which had that other stuff before it. In Anderson, I thought it was equivocal when Anderson said, I plead the Fifth. The reason Anderson is distinguishable, Your Honor, is that Anderson twice before had indicated to the officers in that case that he did not want to talk to them anymore. He was done with the interview. So there were no circumstances leading up to, I plead the Fifth, that could have rendered it ambiguous or equivocal. It was clear. I mean, it was in isolation. I plead the Fifth. There was nothing else before it. There was no cooperation on the part of Anderson beforehand. He told the detectives in that case, I don't want to talk about this anymore. Do you have any Supreme Court case that you can cite to me that says that in making the analysis of whether or not the suspect has clearly invoked his right, that we look to the entire context of the interview? Because that's really what you're arguing. That's correct, Your Honor. And we have, in Smith v. Illinois, we can't, that case says we can't look at subsequent responses to cast retrospective doubt on the initial invocation, which we're not looking at here. What we're looking at is, and there's no case up until Bergwies v. Tompkins in 2010, which extended the reasoning of Davis v. United States to the invocation of the right to remain silent. As you know, Davis involved the invocation of the right to counsel in a post-waiver situation, which is also different. We don't have that, which further proves that we have no clearly. I made that argument in Sessoms v. Iowans. You did, Your Honor. You did, yes. So in that case, they extended that reasoning of Davis and said, you know, it has to be unambiguous and unequivocal. And here it was reasonable. Now, the district court made its own judgment call and said, you know what, this wasn't ambiguous. And it was perfectly reasonable to make that, I mean, if the district court thought that, that's fine. But the state courts, sorry, go ahead, Your Honor. Go ahead. The state courts were also reasonable in determining that it was ambiguous, given the context. So under ad podeference, looking at it through that lens, you have to defer. There cannot be said that there's no possibility for fair-minded disagreement on this issue. There is. I mean, we're having the disagreement right now, so. Well, you and Mr. Cleance were. Yes. I want to go back to Detective Dupree's testimony. Yes. Because I'm wondering, you know, if the statement prefaced with the ums and the uhs. Correct. If then there's the expression of surprise or question. Right. Depending upon where you sit. Right. Of Detective Dupree. Can't you see, can't his testimony be interpreted as saying that the I'll talk, which follows immediately after his expression of surprise? Can't that be seen as one statement? What can be seen? I guess I'm not understanding, Your Honor. What can be seen as one statement? I'll talk. With his statement about. I choose to remain silent. I choose to remain silent. Yes. In other words, it's a continuum. It's not, they're not looked at in isolation. Right. I suppose you can look at it that way. And, you know, it further bolsters the fact that this invocation wasn't an invocation at all. That he was kind of, you know, thinking about it or made some ambiguous statement. And, you know, it was further clarified when they said you don't want to talk to us. He thought about it for 14 seconds. Right. After they told him you could stop talking any time you wanted. Right. And then there's this long. The 11th Circuit in Medina v. Singletary, we faced a similar situation. I see that I'm way over my time, but I just want to. You didn't answer the question. Yes. I mean, we're really wrestling with this. Right, right. So in Medina v. Singletary, the 11th Circuit, we faced a very similar situation here. Where the detective spoke to the suspect, not on the record, not on tape. And said, hey, you know, we want to talk to you about this murder. And read him his Miranda rights. And the suspect said, I'm willing to talk to you about what I know. Then they go into an interview room. They turn on a tape recorder. They go through everything again. And the detective says, so do you want to talk to us? A very simple question. Do you want to talk to us? And Medina says, no. And the detective says, you do want to talk to us or you don't want to talk to us? And then Medina says, sure, I'll talk to you. So the 11th Circuit found that the response no to a very simple question, do you want to talk to us, was ambiguous and equivocal in light of the circumstances that led up to it. Completely cooperative beforehand, the detective had no reason to think that this suspect did not want to speak to him. And the question, the word, the answer, no, was ambiguous and equivocal in that context. So looking at that circuit's case and looking at the way that courts have applied Miranda and Davis and extended it to the right to remain silent, it cannot be said that the state court unreasonably applied whatever Supreme Court precedent was clearly established at the time in denying Petitioner's claim. The context was very important in this situation, and thus it was reasonable for the state court to deny Petitioner's claim. And I'll reserve my time. Thank you. Thank you, Your Honor. Good morning, Your Honor. 25 money on behalf of Mr. Client. Your Honor, I may – I want to first address the context here. The State places a lot of emphasis on context, but all we have here is two things. Number one, Detective Dupree testifying that he had a cordial relationship with Mr. Client. Never in a custodial interrogation setting. Just simply out on the street asking Mr. Client questions about different types of crimes, different things going on in the street. They had mutual respect, I think he testified. They had mutual respect for one another. Correct. The second part that you have is that we know for a fact, coming from the very – from the very detectives that testified, one at the preliminary hearing, and Detective Felix testifying at the preliminary hearing, and Detective Dupree testifying at the suppression hearing, that they never told Mr. Client, either in Long Beach or en route from Long Beach, to the station that they were going to talk to him about the murder. When they get to the station, shortly, and I think it's in there in the tape recording, in the transcript, it says, They just simply told him, we're going to talk about spurs murder. Took him in there, advised him of his rights. He hesitated, not in the sense that he was equal vocal in his assertion, but he hesitated because he wanted to first determine whether or not he would be afforded a private attorney. Meaning he had absolutely no idea about that. So he asked that question. And then when he realized that he would be given a public defender, he said, Okay, I'm going to up, out, and I'm going to go ahead and assert my right to remain silent. There's no question about the fact that he asserted – that assertion itself, facially, and I think the State just conceded that, was unambiguous. Now, had that assertion been ambiguous, then I think taking into consideration the fact that he had indicated a willingness to talk prior to being Mirandized may have some bearing on the issue. Okay, let me ask you a question. What if, in that same situation, the detective – he says – he makes his statement, he makes his assertion, and the detective says nothing, looks up and raises his eyebrows, and then he immediately says, I'll talk. I think it would depend on the trial court's determination of what the – how the raising of the eyebrow, what that indicated. And the court would be able to make that determination. All right. What happens if the detective doesn't raise his eyebrows? The detective puts his pen down and sits back and just looks down. Oh, I think that would be permissive. And he says, I'll talk. I think that would be – yeah. I mean, that would be – that would not be interrogating him. That would not be questioning him. So you agree that if it's just an expression of surprise on the part of the investigators, then you can look at that interaction as a – as one interaction, not separate statements. Even if I were to agree with you, Your Honor, I think Smith v. Illinois would not permit that to happen. The U.S. Supreme Court in Smith v. Illinois said you cannot use post-invocation conduct or statements to cast retrospective doubt on the initial invocation itself. If it's an unambiguous invocation. If it's unambiguous. And mind you, in Smith, all you had is, oh, I'd like to do that. And the court said right there and then that was a clear invocation. Quote, oh, I'd like to do that. But you'll agree that if it's any ambiguity, then there's nothing wrong with the investigators asking a follow-up question for clarification, which Davis clearly says. Clearly. Clearly. And under Thompkins, the 2010 U.S. Supreme Court case, I think you could apply Davis. But Davis would only come into play. Now, remember, Davis was post-waiver, which lent more credibility to the fact that this was an ambiguous invocation. This was post-waiver. In Davis, the defendant had already or the suspect had already decided to talk to the officer, had talked to the officer for a long time, and then in the middle of the hearing, the officer went ahead and asked clarifying questions. And then he says, I think I want to talk to a lawyer. And the questioning premosly ceased at that point. And this ---- And so after he says, I choose to remain silent, there's a surprise by the officers, and then he says, I'll talk. Then he goes ahead and signs a written waiver at that point. Two distinct inquiries, Your Honor, under Smith. The waiver inquiry and the invocation itself are two distinct. And you can't mix the two together, particularly when you're applying post-invocation conduct. So in order to make your argument effective, I have to determine that the I'll talk is post-indication conduct. I don't think ---- What if I say it isn't post-indication? What if I say it's all a part of the same? I choose to remain silent and somebody says, well, that's a surprise to me. Oh, no, I'll talk. I would respectfully suggest ---- I mean, I don't see that as post-indication at all. That's all a part of the same. I would respectfully suggest, Your Honor, to review Smith v. Illinois. You think Smith says that? I think Smith clearly stands for that proposition. All right. I'll read Smith again. Let me ask you, though. You keep focusing on the I choose to remain silent. How can you divorce that statement from the process he goes through, the mental process he goes through in making that statement, which is the ums, the ahs, and the pauses? I think that supports my position, Your Honor. It's all part of it. I absolutely think ---- I'm not just ---- in fact, I think the very fact that he did think about the ---- he deliberated, he clearly deliberated about the issue. He said I have two rights here, one right to cancel, one right to remain silent. He figured his right to cancel is not going to be as strong because he would be relying on a public defender. Then he said, okay, you know what, I'm going to go ahead and assert my right to remain silent. And he clearly asserted it. If Miranda means anything, Your Honor, if Mosley means anything, then at that point, the questioning must cease. Now, Mosley, unlike Edwards, allows you to reinitiate contact with the suspect. There's no question about it. However, that initiation must be limited. It has to be about a different crime. I mean, you can tell right there and then that how jealously the Supreme Court is protecting the right to remain silent. It's not protecting it as much as Edwards, but it's clearly protecting it in a sense that it's saying, look, you cease the interrogation. In fact, even the subsequent statements, even if it's about an unrelated crime, for those to come in is conditioned upon scrupulously honoring the initial invocation. So there has to be that initial cessation of it. What if the officer just said in response to his, I choose to remain silent, you choose to remain silent? I think that would be interrogation. Absolutely. I think at that point in time, what you're doing, you're questioning someone's invocation of a right to remain silent. When that invocation itself facially is unambiguous and the circumstances preceding. Now, remember, in Anderson v. Terry Hewitt, I will judge Tom, Judge Tolman descended from that opinion. As a matter of law, you can't look to circumstances leading up. That's the way I read Anderson. But assume that not to be the case. If it's an unambiguous statement. If it's an unambiguous statement. Even Anderson supports the concept of allowing follow-up questions if there's ambiguity. There's clearly, I completely agree with you, Your Honor. It turns on whether or not it's an ambiguous or unambiguous statement. It clearly does. But as a matter of law, the Ninth Circuit sitting unbanked, with the exception of Judge Tolman and a few other judges on the panel. Well, but Anderson, it's really this case. No, it isn't. I'm not relying on Anderson at all. The facts are much different than Anderson. Isn't Anderson factually distinguishable in this case? I'm not even relying on Anderson. I think that you have Miranda, you have Mosley, and you have Smith. Anderson is just an interpretation of those precedents. And for me, I think it's also worth repeating here that Judge Silberman had indicated in the concurrence here, and I think it's worth reading. He says, If Anderson had said, quote, I plead the Fifth, unquote, immediately after having been read his rights, there would be no room for debate, period. And then you have the U.S. Supreme Court case that came out in 2010 that, although it wasn't the case at the time of the State court rendered its decision, but it's telling. It says, and it says, Tompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning, Mosley. Now, my worry is that this all seems pretty simple if I'm interpreting the district court from San Diego or Los Angeles that's a federal district court. But I'm really now saying to myself, can I say on this precedent that the California Court of Appeal or any California last resort court is so that what you're telling me is so clear that they could not see it any other way? Your Honor, if I mean, my worry about this is that my circuit has continued over nine to zip opinions that they don't know what they're talking about to interpret AEDPA as giving no deference to the State court. I think you must give deference to the State court. There's no question about that. But if you were to affirm their reasoning, even under AEDPA, you would pretty much overrule Miranda. In a sense, I think you would overrule Miranda and Mosley. And you would have to overrule Smith to get to that result, because you would have to somehow, either consciously or subconsciously, rely on what occurred post-invocation to somehow render the invocation itself ambiguous. Well, I'm having, this may be a better question for Ms. Ali, but I'm having a testimony when he was asked to explain the 14-second delay in which he says, I felt like he was just making his decision. He was taking his time, making a decision. And when he asked me, and when I finished the question, he gave us an answer, and that was it. And to me, that's a pretty clear statement by the interrogating officer that I understood what he had done. There's nothing ambiguous about it. He invoked. In addition, Your Honor, I would add that if you were to allow, let's assume for a moment that relying on circumstances pre-invocation would be permissible under a pre-established precedent. Let's just assume that for a moment. What do we have here? Is it permissible under Miranda to say that every time you have mutual respect with the police officer or have engaging conversations with them, that that, in addition to pre-being read your Miranda rights, never in a custodial interrogation setting, you had indicated some willingness to cooperate, that that, in and of itself, would render a facially ambiguous statement ambiguous? It makes absolutely no sense. To come to that conclusion, you would have to basically say, you would have a police officer understand saying, well, I knew this guy. He's in a gang. I see him on the streets all the time. I talk to him. He invoked. I felt like we had some sort of a relationship. So, you know, I figured I can get him to talk to me. That's precisely what happened here. And I think you should also recognize, Your Honor. So you disagree that it was an expression of surprise? Because that's what the Court found in reviewing, that it was an expression of surprise. Even if it were an expression of surprise, Your Honor, it wasn't an – it would not be permissible. I think under Mosley, it's very clear. Once you assert your right to remain silent, all questioning must cease. And I don't believe it was entirely an expression of surprise. Because what did it – what did it have? What happened next? You're either going to rely on what the State court does or you're not. And I have to rely on them. They said, utters of expression of surprise. And that's the worry that I have in this particular situation. The State court, interpreting the same stuff I'm interpreting, has the right, as long as it's not unreasonable, to say what the facts are. And it seems to me that if somebody just utters a statement of surprise, and immediately the guy says, I'll talk, I have a tough time saying that's post. It seems to me a part of the same. Why is it not part of the same? I choose to remain – I'll talk. But that would depend on saying that the expression of surprise is not interrogation. Well, they didn't. They said it wasn't. They said it's an expression of surprise. They didn't say it had anything to do with interrogation. Instead, they says rather than request for clarification. Correct. Clarification is not an issue right now. The issue that we're dealing with – Oh, we're talking about interrogation. They did not – they weren't trying to clarify. They weren't trying to interrogate. They just surprisingly expressed. So what I'm – what I'm hearing from you, Your Honor, is that instead of – under Miranda and Mosley, so long as there's an expression of surprise, all questioning don't have to cease. And that's not what the Supreme Court has said. The Supreme Court has made very clear, rigid rules. And if that – But even you said if they'd raised their eyebrows in surprise, wouldn't have been any problem. No, I never – I said I would depend on the credibility of the witness. Well, the credibility has been determined by the State court. But the expression of surprise is not the same as ceasing interrogation immediately. They're two different things. But the statement, you don't want to talk to us, cannot be interpreted to be a question of interrogation. I have a case I cited in my brief that's – that is a similar setting where the Court has said that that would be – it's not entirely – it's not exactly like do you want to talk to me, do you want to talk to us. It's very similar to it. And I will get to that in a moment, but – Let me – let me – I just need to ask you a follow-up question. Sure. I thought earlier in your – in your argument, you – you stated that this case is distinguishable from Anderson. Anderson isn't really implicated in – in this case, right? I'm not entirely lying on Anderson. Yes, you are. I'm – I'm – I'm – That's not what – that's not what – that's not what you said earlier. You agreed with me earlier that Anderson didn't apply. I take your question as a seeking clarification. So let me – if I may. Now you're – it's a post. Right. Post. So – Let me – let me clarify it for a moment. My – my – my – Wait. Let me raise my eyebrows. What I said was, what I believe – what I meant to say, what I believe I was communicating with Your Honor was, in – in Anderson v. Terhune, the court sitting on Banks said that you cannot use context to render a facially unambiguous invocation ambiguous, period, as a matter of law. It doesn't matter what was going on, as a matter of law. And you agreed the facts in Anderson are – are distinct from the facts in this case. I don't think it even mattered at that point, because it's a matter of law, the court held. But isn't that – isn't that – wasn't that the entire premise upon which the district court made its decision in this case? Not correct, Your Honor. Well, I'm reading it. I've got it right here in front of me. Anderson, Anderson, Anderson. Yeah, but they did refer to name – Anderson. The whole analysis is Anderson. Right, but they named Anderson. But Anderson also – I mean, they – Anderson incorporates Mosley, Smith, and Miranda. They discussed all three of those cases to get to the result. And the result makes sense. I think – I think – again, I think it would be a – in Anderson, as Judge Tomlin indicated earlier, you did have somewhat of an ambiguous statement, particularly because it happened so far into the interrogation. This happened at the very, very outset. So the longer the interrogation, the more ambiguous I can say the statement is? Even if – Even if it's post? Even if you go that way, Your Honor, Davis would cut you off. Because Davis says that post waiver, if you assert your right unambiguously, all questioning must cease. But if it's ambiguous because you've been chatting all along about the crime and has – and I think there's a quote in there that the Court is using, saying, look, this man in Davis, Mr. Davis, had already indicated a willingness to speak to the officers unassisted. That by itself could create some ambiguity. This is post – after he was Mirandaized. In our case, he – after he was Mirandaized, he never waived. But isn't that a double-edged sword? If you don't – if you don't permit some follow-up questioning where it's ambiguous, you have a situation in which a defendant maybe really wants to assert and doesn't clearly assert because the police didn't ask any follow-up questions. I mean, it cuts both ways, doesn't it? Well, Your Honor, Davis, you really don't have to ask follow-up questions. I mean, it's – the Court says that you should, but you don't have to. But I think in a case where someone is unambiguous – is, excuse me, ambiguous about their assertion, entirely different case. I think entirely a set of laws apply to that. Davis applies to it. Thompkins applies to it. But in this case, a whole different set of law applies, because you do have a facially unambiguous assertion. And the circumstances leading up to that assertion are not that strong, are nothing, are basically cordial relationship. What if the detectives had just closed up their papers, stood up and looked at them and said, okay, we're done here. And as they're walking out the door, he says, I'll talk. Entirely – then I think in that situation, again, that would depend on how the getting up and saying closing the book and leaving was. I think that would depend on the testimony, Your Honor. I couldn't tell you in isolation how that would mean as a matter of law. I don't think it's any different from saying, okay, you don't want to talk to us. I think it is different. Because when you're sitting in the room – and I don't know if you, Your Honor, had an opportunity to view the tape. I did. I did. When you're sitting in the room, when you're getting up early in the morning, when we wake you up early in the morning, they bring you into a room. They don't tell you what they want to talk to you about. They say you're on the – they talk to you about the guns. They bring you in. Then they say, hey, you know, we're going to ask you some questions, take you around. As a man thinks about his rights, says, I want to assert them. What more does the Constitution require? Okay. I think we have your argument well and handmissly. I'll give you a couple minutes in rebuttal. This argument has been very helpful. I want to thank you both. Go ahead. Thank you, Your Honor. I'll try to be as brief as possible. What we have in Smith and Mosley and Miranda, those cases do not stand for the proposition that you cannot consider context in determining whether a suspect has actually invoked his right to remain silent. And what this Court really has to determine, was it unreasonable for the California Court of Appeal to deny relief? Was it unreasonable? Forgive me. I'm going to read briefly from the Court of Appeal's opinion. Was it unreasonable for the Court of Appeal to find as follows? As stated previously, the inquiry into whether the suspect has unambiguously requested counsel is an objective one. And I cite Davis there. The issue is what a reasonable officer in light of the circumstances would have understood. Detective Dupree, whom the Court found a credible witness, testified that both he and Detective Felix spontaneously uttered expressions of surprise when Petitioner said he chose to remain silent. The tape recording, the transcript, and the testimony of the detective confirmed this to be the case. The detective's questions can reasonably be interpreted as spontaneous expressions of surprise rather than direct requests for clarification. And then going on, even if we were to consider the questions as requests for clarification, the officers did not act unreasonably, given the circumstances of their interaction with Petitioner up to that point. Petitioner had told the officers before entering the interview room that he was going to tell the detectives what he knew about the murder of Keith Stewart. We conclude that the trial court did not err. So this Court has to decide, was it unreasonable for the California Court of Appeal to make this finding and deny Petitioner's claim? And because there was no clearly established Supreme Court precedent requiring the State Court to grant relief on Petitioner's Miranda claim, the Court of Appeal was reasonable in denying it. And, you know, that's really the question here. All right. I think we have your argument firmly in mind. Thank you both. Thank you. Very well argued. We will stand adjourned until 9 a.m. tomorrow morning. I confirm Judge Tallman's appreciation. I don't think I've had a claim argued any better on this issue than you two have done. I'm very impressed. Thank you both. Thank you.
judges: Burgess, Tallman, Smith